[No. 18087.   Department One.   March 1, 1924.]

# HILL SYRUP COMPANY, *Respondent*, v. MARINE NATIONAL BANK, *Appellant*.[1]

APPEAL (149)—PRESERVATION OF GROUNDS—EXCEPTION TO FINDINGS. Under Rem. Comp. Stat., § 383, exceptions to findings of fact may be stated orally when the decision is made, referring thereto by number separately; and entitles the appellant to base error thereon, notwithstanding the trial judge failed in his duty to make proper record of his indorsement thereof upon the findings.

CORPORATIONS (169)—REPRESENTATION BY OFFICERS—PAYMENT OF PERSONAL DEBTS—REIMBURSEMENT. In an action against a bank to recover corporate funds paid to an officer on his personal debt without authority, books kept by the officer, who had sole management of the corporation, held insufficient to show that he had reimbursed the corporation for the funds so paid.

SAME (155, 169)—REPRESENTATION—PAYMENT OF PERSONAL DEBTS —AUTHORITY—EVIDENCE—SUFFICIENCY. No implied authority to a corporate officer to pay out the funds of the corporation on his personal debt is shown, where he was in sole charge of the business and indebted to the company, the only other trustee denied any knowledge of such payments, and the by-laws provided that no contract shall be binding unless authorized by the trustees at a regular meeting, and no claim of such authority was ever made.

SAME (160)—PAYMENT OF PERSONAL DEBT—CHECKS—NOTICE. A bank paying out corporate funds in satisfaction of the personal indebtedness of the officer drawing the corporate checks, is bound to take notice that corporate funds are being used to pay his personal debt, and has no right to assume that he had authority so to do.

SAME (153, 158) — REPRESENTATION BY OFFICERS — AUTHORITY — RELEASE OF CLAIMS. A corporation is not bound by a release, signed by two of its five trustees, acknowledging full satisfaction of all claims against its former president and general manager (which included the misappropriation of $5,000 used to pay his personal debt), in consideration of $750 and a quitclaim of rights of doubtful or no value, the release showing on its face that the two trustees were personally interested in its execution.

[1]Reported in 223 Pac. 595.

SAME (166)—REPRESENTATION BY OFFICERS — RATIFICATION — RE-
CEIPT OF BENEFITS. Such a release is not ratified by the receipt of
the $750 paid, where the company never received any substantial
benefit from the $750 recited as part of the consideration or from
the other property.

TOLMAN, J., dissents.

Appeal from a judgment of the superior court for King county, Hall, J., entered February 9, 1923, upon findings in favor of the plaintiff, in an action for money received, tried to the court. Affirmed.

   *Shorts & Denny* and *Herr, Bayley & Croson,* for appellant.

   *James R. Chambers* and *W. Z. Kerr,* for respondent.

PARKER, J.—The plaintiff syrup company seeks recovery from the defendant bank of the sum of $5,007.77, claimed by the company to have been paid to the bank by W. E. Sander, president and general manager of the company, from its funds without authority from its trustees, upon a debt owing by him personally to the bank, under circumstances charging the bank with notice of such want of authority and of the fact that the funds so paid were the property of the company. A trial in the superior court for King county, sitting without a jury, resulted in findings and judgment awarding to the company recovery as prayed for, from which the bank has appealed to this court.

   The controversy in the superior court and here has to do with the affirmative defenses set up by the bank, in substance: (1) That the payment so made by Sander was authorized by the trustees of the company, and when made was ratified by them by the amount thereof being charged against Sander upon the books of the company, with their knowledge and assent; the company being then indebted to Sander, as it is claimed, in an amount nearly equal to the amount of

the payment so made; and (2) that thereafter, upon the auditing of the books of the company, including Sander's accounts with the company, it executed a full satisfaction of all its claims against Sander, including any sum which may have become chargeable to him by reason of this payment from its funds in satisfaction of his personal indebtedness to the bank; which release, as it is claimed, was executed for valuable considerations passing from Sander to the company.

Counsel for the company have moved to strike the statement of facts from the record. It is argued that we should ignore the statement of facts because the findings made and requests for findings refused to be made by the trial court were not properly excepted to; and that since no question is presented which can be considered without the aid of the statement of facts, the judgment should be affirmed. It may be conceded that it appears from the record, in so far as the exceptions are evidenced by indorsement thereon by the trial judge, such exceptions are so general in form as to not be sufficient under our decisions. It appears, however, from the statement of facts certified by the trial judge that, at the time of the taking of the exceptions by counsel for the bank, being the time of the signing of the findings by the trial judge, the several findings made, as well as the requests for those refused, were referred to in counsel's orally stated exceptions by number separately. This court has repeatedly held that exceptions so taken are sufficient to bring to this court the claim of error or errors thereon. *Ranahan v. Gibbons,* 23 Wash. 255, 62 Pac. 773; *Young v. Borzone,* 26 Wash. 4, 66 Pac. 135, 421; *Burrows v. Kinsley,* 27 Wash. 694, 68 Pac. 332; *Pickford v. Borland,* 76 Wash. 339, 136 Pac. 128; *Wright v. Tacoma,* 87 Wash. 334, 151 Pac. 837. We do not lose sight of

the provisions of § 383, Rem. Comp. Stat. [P. C. § 7811], reading, in part, as follows:

"Exceptions to . . . findings of fact or conclusions of law . . . may be taken by any party, either by stating to the judge, . . . when the . . . decision is signed, that such party excepts to the same, specifying the part or parts excepted to (whereupon the judge, . . . shall note the exceptions in the margin or at the foot of the . . . decision); or by filing like written exceptions within five days after the filing of the . . . decision, . . ."

When counsel orally take exceptions to findings at the time they are made, or requests for findings at the time they are refused, it manifestly becomes the duty of the judge to make proper record thereof by indorsement upon the findings and requests for findings. In this particular case such indorsement of the judge, it may be conceded, was too general in terms; but manifestly counsel taking the exceptions, having properly stated the exceptions, were not to blame for that. We think that, where the indorsement of the trial judge evidencing the taking of exceptions, read in the light of a statement in the statement of facts, plainly shows that such exceptions were directed to each finding separately by number, and to each refused request separately by number, such record of the exceptions sufficiently evidences their proper taking. We therefore conclude that we cannot ignore the statement of facts. This calls for our consideration of the cause upon the merits.

For many years past, the Hill Syrup Company has been a corporation of this state with its principal place of business at Seattle. W. E. Sander was its president and general manager for several years prior to June, 1921. He and two others then constituted its board of trustees. By common consent of the other two, he had

entire charge of the company's finances and entire supervision of the keeping of its books of account. The other two were engaged practically exclusively in the manufacture and marketing of the company's products. One of them was secretary, but performed no duties of such office other than to sign such minutes of meetings of the trustees as were kept; such meetings being of very rare occurrence, and formal action thereat touching the company's affairs being of equally rare occurrence. Even the formulation of such minutes as were kept was seemingly the work of Sander. Some of the meetings, as the testimony shows, were supposed, rather than actual, meetings, though evidenced by minutes apparently proper in form. Sander was, up to about June or July, 1921, the owner of a majority of the capital stock of the company, but a substantial quantity of the stock was also then owned by others.

For sometime prior to January, 1921, Sander had been in the habit of paying his personal obligations with checks signed by the company by him as president against the bank account of the company, and causing the amount thereof to be charged against himself upon the books of the company. Such issuance of the company's checks here in question in January, February and May, 1921, was but a continuation of that habit. From time to time he made reimbursements in form to the company, so that upon the books of the company on May 31, 1921, he appeared to be indebted to the company in the sum of $246.77 only. The reimbursements so made in form by Sander to the company consisted of property of very questionable value, but for the most part of his own promissory notes, which in turn were in form satisfied by turning over to the company property of very questionable value. No for-

17—128 WASH.

mal action was ever taken by the trustees of the company authorizing Sander to so use the funds of the company. Nor does the evidence show any implied acquiescence by the other trustees of such use of the company's funds by Sander. The bank was never a depository of the funds of the company, and none of its officers had any knowledge whatever that Sander had ever paid with the funds of the company any of his personal debts. So, of course, the bank's officers had no reason whatever to suppose that Sander had any authority to use the funds of the company in paying his personal debts. One of the by-laws of the company, evidently of long standing, reads as follows:

"No contract or agreement shall be binding upon this company unless authorized by the board of trustees by resolution passed in regular session, and no officer of this company shall have the right to bind the company by any contract, in writing or otherwise, except by resolution of the board of trustees as aforesaid."

On January 24, 1921, Sander personally owed the bank a matured debt amounting to $5,000. On that day he gave to the bank a company's check against the company's deposit in another bank for $1,500 to apply on such indebtedness, which check was signed by the company by himself as president. On February 21, 1921, he gave to the bank another similar check for $1,000 to apply on such indebtedness. On May 5, 1922, he gave to the bank another similar check for $2,507.77 to pay the balance, with interest due, upon such indebtedness. Soon thereafter it first became evident to other stockholders of the company that its affairs were in a precarious condition, when upon examination into its affairs and an auditing of its books soon thereafter it became evident that the company was insolvent. It was then demanded of Sander by other stockholders

that he transfer all his stock to another person in trust for all of the other stockholders, to the end that his relation to and interest in the company be terminated, and that it might be reorganized. Sander thereupon made such transfer of his stock; it manifestly being of no value because of the company's insolvency. Thereupon one Vaux became president and one Kerr became secretary, who, together with three others, became the trustees of the company; the number of trustees being increased from three to five. Thus the company was reorganized. About that time an agreement was entered into by the new management of the company with its creditors by which they were to take fifty cents on the dollar on their claims, allowing the business to proceed as usual, under an arrangement by which the creditors would be represented in its management until they should be so paid; thus avoiding formal bankruptcy proceedings in court.

On January 16, 1922, this action was commenced by the company, seeking recovery from the bank of the amount of the money so paid to it by Sander upon his personal indebtedness. Vaux and Kerr had purchased a considerable amount of stock in the company at the instance of Sander sometime prior to January, 1921, induced, as they claim, by false and fraudulent representations by Sander with reference to the affairs of the company and the value of the stock, representing in substance that the stock was valuable, when it was, in fact, worthless. They were claiming several thousand dollars damage against Sander personally on account of such representations made by him. In the meantime Sander had been adjudged a bankrupt and desired to be discharged of his debts by the bankruptcy proceedings, and to that end sought a release from Vaux and Kerr and the company of all claims they

might have against him. Following negotiations between Sander and Vaux and Kerr, the following paper was executed:

"This will acknowledge the receipt from W. E. Sander of the sum of ($750.00) Seven Hundred and Fifty Dollars, which together with a quit-claim deed to certain property heretofore delivered, constitutes a full settlement of claims of every nature and kind of Hill Syrup Company, a corporation, and of any claim which the undersigned individuals have or claim to have against the said W. E. Sander, provided, however, that in the event that it is discovered that there is any property wrongfully concealed in the bankruptcy proceedings that this property can be subjected to any claim which the undersigned may have. It being understood that the settlement referred to is to allow Mr. Sander to proceed from the time of the bankruptcy without molestation. If any property is found at any time within a period of two years from the date of the beginning of the proceedings in bankruptcy, which property was wrongfully concealed, then this property may be used for the purpose of satisfying any claim. But after the expiration of the period of two (2) years no claim of any nature or kind is to be presented by the undersigned.

"Dated at Seattle, Washington, this 19 day of June, 1922.

                    "Hill Syrup Company,
                         "By J. W. Vaux, President,
                         "By J. Chas. Kerr, Secretary,
                         "J. Chas. Kerr,
                         "J. W. Vaux."

The evidence warrants the conclusion that none of the trustees of the company, other than Vaux and Kerr, ever gave their assent to the execution of this paper. Vaux and Kerr both say that, in any event, this purported release was never intended to release Sander from his obligation to the company growing out of his payment of its funds to the bank here in question.

Thereafter the bank filed in this case its amended affirmative answer setting up the execution of this paper as a complete satisfaction of any claim the company might have against Sander for the payment of its funds to the bank upon his personal indebtedness, and hence, in legal effect, a discharge of the bank from all obligation to the company with reference thereto.  Thereafter the cause came on for trial in the superior court, and resulted in judgment being rendered against the bank on February 9, 1923, from which this appeal is prosecuted.  Other facts will be noticed as may seem necessary in our discussion of the several questions presented.

It is contended in behalf of the bank, in substance, that the evidence calls for the conclusion that the company has been reimbursed by Sander, at least in some substantial measure, for the $5,007.77 of its funds paid by him to the bank towards his personal indebtedness. If this be true, it may be conceded that the company could not recover that amount, or such portion thereof as to which it had been reimbursed.  This, however, as we view the record before us, is a question of fact which, in the light of the evidence, we think, must be decided against the bank.  To review the evidence here in detail would be but to relate a long and somewhat involved story.  Looking alone to the entries upon the books of account of the company, a plausible argument can be made in support of the bank's contention that the company has been wholly, or almost wholly, reimbursed by Sander; but when such entries are viewed in the light of the fact that Sander had the entire management of the finances of the company and entire supervision of the keeping of the books of account of the company, and in view of the manner in which Sander purported to reimburse the company from time to time

for the use of its funds in the payment of his personal debts, such argument loses all substantial support. Further comment on this point, we think, is wholly unnecessary. We conclude that the company has not been reimbursed by Sander, or anyone else, for any portion of the $5,007.77 so paid by him to the bank.

It is further contended in behalf of the bank, as we understand its counsel, that Sander, in legal effect, had authority from the company's trustees to pay out its funds upon his personal indebtedness and charge any such payments to himself upon the books of the company. It might be well argued that even a unanimous vote of the trustees could not lawfully give Sander any such authority beyond authorizing him to so use the funds of the bank up to an amount equal to what the company might be owing him when any such payment was made; and it is apparent, we think, that the whole of the amounts of Sander's payments to the bank here in question were made when he was indebted to the company instead of the company being then indebted to him. However, we have seen that no express authorization was ever given by the trustees of the company to Sander to so pay out funds of the company. The question then becomes one of the trustees having lawfully given Sander implied authority to so pay out funds of the company.

One of the three trustees, the secretary, died in April, 1921, leaving Sander and one other as the only trustees up to the time Sander severed his relations with the company and its reorganization. This trustee testified positively that he never acquiesced in and never knew of Sanders paying out any of the funds of the company upon his personal debt until after the last check was given by Sander to the bank on May 5, 1921, and that he had no knowledge of Sander's management of the

finances of the company such as would suggest the necessity or advisability of making any inquiry with a view of ascertaining the making of any such use of the company's funds by Sander. This we believe to be true, as the trial court manifestly believed; so whatever claimed implied authority Sander had in that respect must be implied from Sander's own acts and the possible acquiescence therein by the trustee who died in April, 1921, and whose testimony, of course, we do not have touching such claimed authority. Even if we had the testimony of that trustee favorable to Sander on the question of his claimed implied authority it would only at best show an acquiescence by only one disinterested trustee.

Viewed from any angle, it seems plain to us that Sander never acquired any authority, express or implied, to use any of the funds of the company to pay any of his personal debts, if, indeed, such authority could, under any circumstances, be given to him by the trustees of the company. Besides, the bank never had any suggestion of any such authority on the part of Sander, nor even any claim of such authority on his part, other than as evidenced by the face of the three checks against the funds of the company given by him to the bank to apply upon his personal indebtedness to it. That this is not such evidence of Sander's authority to so use the funds of the company, upon which the bank had a right to rely, is rendered plain, as a matter of law, by all the authorities. The checks upon their face told the bank that it was the company's money, and not Sander's money, that it was receiving from him towards the payment of his personal indebtedness. Our own decisions, and many of other jurisdictions, lead, we think, irresistibly to the conclusion that the company's trustees never, either expressly or impliedly,

gave to Sander any authority to so use the funds of the company, and that the bank had no right to assume that Sander had any such authority. *Mooney v. Mooney Co.,* 71 Wash. 258, 128 Pac. 225; *Hoffman v. Gottstein Investment Co.,* 101 Wash. 428, 172 Pac. 573; *Farmers Market v. Austin,* 118 Wash. 103, 203 Pac. 42; *Barto Co. v. Aylmore,* 125 Wash. 394, 216 Pac. 857; *Schaffer v. Sunnyside-Yakima Oil Co.,* 125 Wash. 689, 215 Pac. 958.

Was the above quoted purported release of Sander, executed in form by the company by Vaux, its new president, and Kerr, its new secretary, in legal effect an acknowledgment by the company of reimbursement by Sander in full, or even partially, for the $5,007.77 so paid by him to the bank upon his personal indebtedness? It is so argued by counsel for the bank. No express authority for the execution of any such release was ever given by the trustees of the company; nor, as we view the record, was there any implied authority for the execution of such release ever given by the trustees of the company. The release upon its face may seem to evidence the assent of Vaux, its president, and Kerr, its secretary, who were but two of the five trustees, as a release of all claims of the company against Sander, including the one here in question. Vaux and Kerr say that the company's claim here asserted against the bank, which of course, was also an obligation equally against Sander, was not considered or suggested as intended to be released by the execution of that paper. If this evidence be admissible, as respectable authority seems to hold (17 Cyc. 749), in view of the fact that this is not a controversy between the parties to the release, it seems to show that the execution of this paper did not release Sander from such claim. However that may be, manifestly Vaux and

Kerr did not constitute a majority of the trustees, and besides, the release on its face shows that they were both interested in its execution, in that there is embodied therein a release of their personal claims against Sander, which, as we read the record, was at all events the main purpose of its execution. We conclude that the execution of this release was not a legal acknowledgment upon the part of the company that Sander had reimbursed it, either in whole or in part, for the $5,007.77 paid by him from the funds of the company to the bank upon his personal indebtedness.

Was this release ratified by the company by the retaining for its own benefit of the consideration, if any, passing from Sander to it for its execution? It is argued in behalf of the bank that it was so ratified. This again becomes little else than a question of fact as to what the company received and retained as consideration for the execution of the release. A reading of the evidence convinces us that the company never received or reaped any substantial benefit from the $750 recited as a part of the consideration for the execution of the release. As to the quit-claim deed mentioned in the release, that was executed by Sander long before the release was executed, at a time when such release was not under consideration; and besides, it was a quit-claim of Sander's equity in certain property which was mortgaged for more than the property was worth. In this connection it seems to be argued that the surrender of Sander's stock constituted a part of the consideration for the execution of the release, but manifestly that was not a consideration passing to the company, but was a consideration passing to the stockholders of the company as individuals; and besides, such stock was at the time worthless.

Some further contention is made in this connection that Sander satisfied a certain claim amounting to

$1,000 against the company as a part of the consideration for the execution of the release. The evidence convinces us that this was a personal matter of Sander's. In short, we are convinced from a review of the evidence that none of the things mentioned in the release as a consideration for its execution, or claimed as a part of the consideration for its execution apart from its recitals, passed to the company, or that it ever reaped any substantial benefit therefrom. We conclude that the release has never been legally ratified by the company, and that it is not estopped from so claiming because of the fact of it having received or retained any part of the consideration for its execution.

We have, in arriving at our conclusions upon the facts of the case, been uninfluenced by any consideration of the question of burden of proof. Were each particular, controverted fact viewed in the light of the law relative to the burden of proof, that is, whether such burden rested upon the bank or upon the company, several of the questions decided by us as questions of fact would, with even greater certainty, be decisive in favor of the company. Viewing this long and involved record and the questions presented in the argument of counsel from any angle, it seems quite plain to us that the judgment of the trial court must be affirmed. It is so ordered.

MAIN, C. J., HOLCOMB, and MACKINTOSH, JJ., concur.

TOLMAN, J. (dissenting)—In my opinion, the record discloses sufficient facts to justify a holding that the release was binding upon respondent. I therefore dissent.